**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | | |
|---|---|---|
| **Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Medical Center and Erlanger Health System,** | ) ) ) ) | **Civil Action No. 1:16-cv-00496** **Judge Phillips** |
| **Plaintiff,** | ) ) | **Magistrate Judge Steger** |
| **v.** | ) ) | |
| **Xerox Corporation; Xerox Business Services, LLC, f/k/a Affiliated Computer Services, Inc. d/b/a ACS,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF**
**THEIR MOTIONS TO DISMISS**

In its Consolidated Response in Opposition to Defendants' Motions ("Response", Doc. No. 14), Erlanger[1] seeks to convince the Court that its claims should survive the Motions to Dismiss filed by ACS (Doc. Nos. 7 and 8) and Xerox (Doc. Nos. 9 and 10) by calling Defendants' arguments "desperate" and frequently (and inaccurately) accusing Defendants of misrepresenting Erlanger's pleadings and the applicable law.  While Erlanger's frustration with the Motions to Dismiss is understandable (and somewhat telling), forcefully insisting that Erlanger's Complaint is well-pleaded does not make it so.  Perhaps more telling is what Erlanger does not refute in its Response:

- Erlanger does not refute that claims arising solely out of the conduct of Whipple have been released and cannot be maintained against Defendants.

- Erlanger does not refute that the Tolling Agreement entered into by Erlanger and ACS only preserved claims that were not already time-barred and claims arising out of Whipple's conduct, not ACS in general or the other unidentified ACS consultants.

---

[1]  ACS incorporates by reference the defined terms, including party identifiers, set forth in the Memorandum in Support of ACS's Motion (Doc. No. 8).

- Erlanger does not refute the discovery rule only tolls the applicable statute of limitations for claims where the party did not know about, or have reason to know about, its potential claims.

- Erlanger does not refute that FCA defendants are not permitted to file claims against third-parties that merely offset FCA liability.

- Erlanger does not refute that it was required to comply with the indemnification provisions of the Agreements and even argues that it was required to provide "full opportunity to defend or participate in the lawsuit" before ACS could be obligated to indemnify Erlanger.

- Erlanger does not refute that in order to hold a parent company liable for the actions of a subsidiary, there must be some justification for piercing the corporate veil or independent actionable conduct by the parent company.

With the above issues now settled, all of Erlanger's claims have been released, are time-barred, and/or are not permitted by law. Indeed, the Complaint identifies only Whipple as the source of the allegedly actionable conduct, but Erlanger has released all claims arising out of Whipple's conduct. Moreover, the alleged contract breaches and misrepresentations all occurred well over six years before Erlanger filed this action and before the Tolling Agreement was signed, making these claims time-barred. Because the Complaint concedes Erlanger's knowledge of Whipple's conduct – and acknowledges that it addressed and complained about the conduct *while it was ongoing in early 2006* – the discovery rule cannot save these claims. The sole claim to which the discovery rule could apply – the theft of confidential information and PHI – is based *exclusively* on **Whipple's** theft and use of that information in the *qui tam* action. That conduct is protected by law, and Erlanger released all claims against Whipple and thus against Defendants.

Moreover, recognizing that it would not be permitted by law to sue ACS solely for the purpose of offsetting FCA liability, Erlanger insists that its settlement with Whipple eliminates the possibility that its claims could ever be dependent on FCA *liability*. While Erlanger provides

authority supporting its position, it does so in lieu of authority from *within the Sixth Circuit* holding that Erlanger's entire Complaint be dismissed.

Likewise, Erlanger argues that because it informed ACS about the existence of the *qui tam* action and its settlement was purportedly made in "good faith," it has not waived its indemnification claim. Erlanger's June 2012 Letter – which includes no mention of indemnification under the MSA – did not afford ACS "full opportunity" to defend or participate in the defense of the Whipple *qui tam* action, as required under the applicable contracts. Without affording ACS this "full opportunity" to defend or participate in the defense, whether or not its settlement with Whipple was in "good faith" is irrelevant.

Finally, Erlanger's Response provides no explanation as to how Xerox could be held liable for the conduct alleged in the Complaint. Erlanger points generally to Xerox's 10-Q filing, but provides no explanation as to how that saves the claims in this case. Furthermore, Erlanger fails to identify any allegations *in the Complaint* that warrant piercing ACS's corporate veil other than Xerox's acquiring ACS four years *after* the relevant time-period. Applying Erlanger's arguments, a parent company would be automatically liable for the action of a subsidiary solely because of its status as a parent corporation. This position is simply not supported by law.

Accordingly, for the reasons set forth in the Motions to Dismiss, the Memoranda in Support and below, the Court should dismiss Erlanger's Complaint.

## I. ERLANGER RELEASED ALL CLAIMS BASED ON WHIPPLE'S CONDUCT.

Erlanger concedes in its Response that all claims against ACS arising out of Whipple's conduct are not viable due to its release of Whipple. (Response, p. 5). Erlanger, however, argues that its claims do not arise out of Whipple's conduct, but instead are direct claims against ACS for "Defendants'" conduct. Erlanger confirms that its allegations relate to the conduct of "Defendants" over "at least a seven-month period to push an aggressive, misguided, and harmful

3

billing initiative and its failure during this period to protect Erlanger's confidential information." (*Id.* at 6). Indeed, Erlanger insists that its allegations do not relate to the conduct of any particular employee. (*Id.*). This position is in stark contrast to the allegations in the Complaint.

First, the "at least a seven-month period" aligns precisely with the time-period during which Erlanger alleges Whipple worked on the Erlanger engagement. (*See* Compl., ¶¶ 32, 49, alleging that Whipple's work on the project began in December 2005 and ended in July 2006 – a seven-month period). Indeed, the latest allegations regarding "ACS's" misconduct are in Paragraph 45, which describes internal hotline complaints made in July 2006 by two Erlanger employees regarding **Whipple's** changes to patient status that had previously occurred. Thus, either Whipple was the sole source of the conduct giving rise to the Complaint, or the problematic conduct coincidentally resolved itself upon his departure.

Second, while Erlanger attempts to make the allegations broader by referring generically to "Defendants" or "ACS consultants," the allegations all trace back to Whipple. Whipple is the only ACS employee mentioned by name (62 times), while no other ACS employee is identified by name, title or even role. (*See generally* Compl.). Indeed, in the Complaint, only **Whipple** was alleged to have personally changed numerous observation patient accounts to inpatient status (¶ 40); only **Whipple's** review of records were allegedly flagged by Erlanger due to concerns about his billing recommendations (¶ 41); Erlanger's Chief Compliance Officer instructed employees to notify leadership directly and immediately if **Whipple** made changes to a patient's chart (¶ 44); **Whipple** is the only employee identified as being "closely monitored" (¶ 48); every alleged complaint made by Erlanger employees to Erlanger's hotlines were about **Whipple's** conduct (¶¶ 43, 45); and **Whipple** is the only employee identified as being removed from the Erlanger engagement (¶ 49). The Complaint alleges no complaints about, special monitoring of, or removal

of any other "ACS consultant." As Erlanger notes, the Complaint includes 110 paragraphs and a detailed timeline of the events purportedly supporting its claims. (Response at 6). Given the detail of Erlanger's allegations, the failure to identify any employee other than **Whipple** is quite telling.

As for Erlanger's assertion that its claims are "direct" not "vicarious," Tennessee has long recognized that a corporation can function only through its agents and employees. *Hall v. Crenshaw*, 449 S.W.3d 463, 472 (Tenn. Ct. App. 2014) (citing *Trau–Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 703 (Tenn. 2002) ("A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents."). Thus, for "ACS" to breach a contract, breach its fiduciary duty, engage in negligent conduct, etc., one of its authorized employees or agents must take some action on its behalf. Erlanger's strategic use of the word "ACS" or "Defendants" in its allegations regarding Whipple's conduct does not change the fact that the Complaint only alleges one individual engaged in wrongful conduct – Whipple.[2]

As to Erlanger's claims regarding the failure to protect confidential information and PHI, Whipple is again the ***only*** individual allegedly involved. Indeed, the Complaint specifically alleges that "[u]pon his removal from the Erlanger engagement, *Whipple* indiscriminately stole protected health information ("PHI") and confidential documents belonging to Erlanger." (Compl., ¶ 51; emphasis added). Tellingly, Erlanger only alleges that ACS breached its duty to protect confidential information from disclosure when "ACS's former employee, *Whipple*, stole Erlanger's protected data, documentation and other information, which included PHI." (*Id.* ¶ 69;

---

[2] As explained by ACS in its Memorandum (*See* Doc. No. 8 at 23-25), to the extent any of Erlanger's claims survive the Motions to Dismiss, ACS requests that Erlanger be required to identify the ACS consultants, other than Whipple (who has been released by Erlanger), who purportedly participated in the alleged conduct. This omission is not merely an issue for discovery as Erlanger suggests. Instead, Erlanger's claims against ACS can only survive a Motion to Dismiss if they are not solely based on Whipple's released conduct.

5

emphasis added). Nowhere in the Complaint does Erlanger allege that "ACS," "Defendants," or "ACS consultants" stole or misused confidential information or PHI.

Moreover, according to Erlanger's Complaint, the only harm allegedly arising from the theft of the PHI and/or other confidential information is that it served as the basis for Whipple's *qui tam* action.[3] (*See id.* ¶¶ 53, 57). Thus, Erlanger's claims regarding the failure to protect confidential information and PHI – whether through contract, tort or otherwise – all *directly* and *exclusively* arise out of Whipple's use of the confidential information and PHI in the *qui tam* action, all of which has been released by Erlanger. (*See* Doc. No. 7-2, ¶ 10). As such, Erlanger's general argument that its claims do not arise out of the conduct of one particular employee (which is disingenuous *at best* as applied to the claims discussed above) simply cannot apply to its claims regarding "ACS's" failure to protect confidential information and PHI.

In light of the above, all of Erlanger's claims should be dismissed because they each arise out of Whipple's conduct, which Erlanger released, thereby releasing any liability of ACS for that conduct. Thus, at a minimum, all claims based on Whipple's conduct fail as a matter of law.

## II. NEITHER THE DISCOVERY RULE NOR THE TOLLING AGREEMENT SALVAGE ERLANGER'S TIME-BARRED CLAIMS.

To the extent Erlanger's claims have not been released (they have), Erlanger's claims should also be dismissed because they are time-barred. In the Response, Erlanger first argues that regardless of the statutes of limitations that apply to its claims, the claims cannot be dismissed at the pleading stage, in part, because the question of whether the discovery rule saves the claims is "fact-dependent." (Response, p. 18). The detailed allegations in Erlanger's own Complaint provide the court with more than enough "facts" to determine that all of the claims are time-barred.

---

[3] As noted previously, no other harm could possibly be alleged given Whipple's assurance in the Settlement Agreement that the confidential information and PHI was only disclosed "in connection with" the FCA action. (Doc. No. 8, p. 12-13, *citing* Doc. No. 7-2, ¶ 20).

6

Next, Erlanger ignores the plain language of the Tolling Agreement in arguing that all of its claims against ACS were preserved. (*Id*. ¶ 19). As explained in ACS's Motion and below, these arguments both fail.

### A. THE "DISCOVERY RULE" CANNOT SAVE TIME-BARRED CLAIMS WHEN ERLANGER ADMITS THAT IT KNEW OF THE PURPORTEDLY ACTIONABLE CONDUCT AS IT OCCURRED.

Erlanger argues in its Response that whether its claims are time-barred is, in part, fact-dependent and cannot be determined at this stage. (Response at 18). Specifically, Erlanger points to the "discovery rule" and argues that because it is a question of fact "whether a plaintiff has exercised reasonable diligence and care in discovering that he has a cause of action," each of its claims should automatically survive ACS's Motion to Dismiss. (*See e.g.,* Response at 18 - 24). The Court need not reach the questions of what Erlanger *could have known* because Erlanger's own Complaint states exactly what it knew and when.

While Rule 12(b)(6) requires the Court to construe all allegations in favor of the non-moving party, the standard does not require the Court to ignore the black and white text of Erlanger's Complaint. Here, Erlanger asks the Court to disregard the clear, detailed allegations about Erlanger's knowledge of the purported conduct of Whipple and others, as well as when such knowledge was acquired. From there, Erlanger asks the Court to accept its position that the breaches and torts were, at least plausibly, discovered at a later date. This duplicitous position ignores the Rule 12(b)(6) standard that focuses only on the pleadings.

To avoid the consequences of its own allegations, Erlanger also attempts to confuse the application of the discovery rule by combining its analysis of what and when Erlanger knew about Whipple/ACS's performance under the Agreement, any representations made in inducing the Agreement, and the alleged theft of confidential information. (*See e.g.,* Response at 19 – 20).

Those distinct issues must be addressed separately when analyzing whether Erlanger's claims are time-barred.

### 1. Claims Relating To Work Performed By Whipple and ACS.

Erlanger argues that that "[b]ased upon the operation of the discovery rule, whether Erlanger knew or should have known it had a breach of contract claim prior to June 18, 2006 [the effective date of the Tolling Agreement] is a purely factual determination that is inappropriate for a motion to dismiss." (Response at 19).[4] Erlanger then recites the fact-sensitive nature of the "discovery rule" concerning the "should have known" prong, while largely ignoring the allegations about what Erlanger did know and when it knew it. (*Id.* at 20 - 22 and 24).[5] Erlanger alleges with precision the purported misconduct by Whipple and "ACS consultants," that it was aware of that conduct *at the time*, and that, in early 2006, it: (1) raised concerns about the conduct's legality; (2) monitored Whipple's behavior; and (3) ultimately pressed ACS to remove him from the project. Importantly, the Complaint does not allege that Erlanger learned *for the first time after* Whipple's

---

[4] As explained in the case law cited by Erlanger, for breach of contract, "the discovery rule applies in cases where the breach of contract is inherently undiscoverable." *House v. Edmondson*, No. W2005-00092-COA-R3-CV, 2006 WL 1328810, at *17 (Tenn. Ct. App. May 16, 2006). A breach of contract is "inherently undiscoverable"

> when the injured party is unlikely to discover the wrong during the limitations period despite due diligence. To be inherently undiscoverable, the wrong and injury must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff.

*Id.* (internal citations omitted). As such, the discovery rule does not toll the limitations period where, as here, the plaintiff had actual knowledge of the purportedly wrongful conduct.

[5] Erlanger states that ACS's conduct was "extensive and occurred over several months, such that it is reasonable to infer that Erlanger did not know, nor reasonably should have known, it had causes of action against Defendants." (Response, at 19-20). Instead of identifying allegations demonstrating delayed discovery of the purported misconduct, Erlanger offers only a blanket citation to Paragraphs 9-63 of the Complaint, which allege in detail Erlanger's knowledge of the purported misconduct *while* it was occurring. (*Id.*). Indeed, the sole example of allegedly delayed discovery of misconduct references Whipple's theft of confidential information and PHI. (*Id.*).

8

departure that Whipple (or any other ACS consultant) engaged in conduct that Erlanger now deems to be actionable. Instead, Erlanger refers only to conduct that occurred *during* the seven-month period during which Whipple was assigned to the Erlanger project, and includes clear allegations regarding its own awareness regarding *all of it,* nearly in real time. The following examples *from the Complaint* regarding Erlanger's knowledge of the alleged conduct **at the time it occurred** illustrate the point:

- "*During the engagement* at Erlanger, ACS and Whipple aggressively pressured Erlanger to bill fewer observation claims and more inpatient claims . . ." (Compl., ¶ 28; emphasis added).

- "On February 1, 2006, ACS's consultants led a meeting with Erlanger's Patient Financial Services ("PFS") Department" . . . where "Erlanger's PFS staff expressed concerns that what ACS's consultants were asking them to do would violate applicable law." (*Id.*, ¶ 36-37).

- Following the mid-February 2006 operation assessment by ACS (*Id.* ¶ 38), "Erlanger employees grew increasingly concerned about ACS's observation rebilling initiatives, as well as with Whipple's bullying and abrasive demeanor. Erlanger pushed back on this initiative and eventually requested that ACS not rebill any more observation claims until ACS had met with Erlanger's fiscal intermediary to discuss the proprietary of ACS's billing directives." (*Id.* at ¶ 39).

- "In March 2006, Erlanger staff met with Whipple to discuss Erlanger's concerns regarding records where patient status had been changed from observation to inpatient." Following that meeting, Erlanger's Health Information Management manager sent an e-mail requiring that all reviews by Whipple be initialed in the upper right hand corner of the fact sheet. (*Id.* ¶ 40).

- "On April 17, 2006, amidst the continued efforts by ACS to push more aggressive patient status decisions and rebill observation claims as inpatient claims, an anonymous complaint was made through HHS-OIG's Hotline alleging that Erlanger was improperly changing observation claims to inpatient status." (*Id.* ¶ 42).

- On May 1, 2006, an Erlanger employee made a complaint about Whipple's rebilling changes to Erlanger's internal compliance hotline. (*Id.* ¶ 43).

- "From May to July 2006, Erlanger's Chief Compliance Officer and certain staff met on multiple occasions to review account where Whipple had changed the patient status from observation to inpatient without a physician order." (*Id.*).

9

- "In June 2006, Erlanger's Chief Compliance Officer informed Erlanger that if they saw any more accounts where Whipple made status changes, they needed to call the compliance hotline or notify Erlanger leadership directly and immediately." (*Id.* ¶ 44).

- On July 12 and 16, 2006, additional complaints were made to the internal hotline regarding Whipple's changes to patient status. (*Id.* ¶ 45).

- "*During ACS's engagement* at Erlanger, Whipple exhibited erratic and bizarre behavior." (*Id.* ¶ 46; emphasis added).

- "In late July 2006, *after all the complaints* from Erlanger personnel surrounding Whipple's conduct and *in light of* Whipple's erratic behavior, ACS finally removed Whipple from the Erlanger engagement." (*Id.* ¶ 49, emphasis added).

Those allegations establish that Erlanger knew in the first few months of 2006 about the conduct – be it by Whipple or any other ACS employee – that now serves as the basis for its claims in this action. Conversely, the Complaint is void of allegations regarding Erlanger's failure to discover the purportedly wrongful conduct relating to ACS's performance of the Agreement. Perhaps Erlanger can claim that it was unaware of what harm (if any) would ultimately result from the alleged conduct, but the "discovery rule" does not toll the statute of limitations until the plaintiff "knows the full extent of his damages, or the specific type of legal claim he has." *Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 608 (Tenn. Ct. App. 2014). Instead, the statute begins to run when the plaintiff has either actual or constructive knowledge of a claim. *Id.*

In sum, Erlanger's allegations are to be taken as true for the purposes of this Motion to Dismiss. Erlanger pleads its *actual* knowledge of the performance-related issues that are the basis of its claims. Unless Erlanger now intends to recant the allegations in its own Complaint, Erlanger's own Complaint provides the necessary "factual determinations" regarding when it knew the alleged conduct. For the purposes of the discovery rule, Erlanger had actual notice of the basis for its Complaint as early as February 2006 when it first met with ACS's consultants to express concerns about the legality of the billing initiatives. (Compl. ¶¶ 36-37). Accordingly, the

discovery rule cannot save any claims arising out of Whipple's (or any other ACS consultant's) alleged billing conduct after February 2006. All applicable limitations periods – including the longest six-year period for contract claims – lapsed well before Erlanger filed suit in late 2016. These claims must be dismissed as time-barred.

> **2. Negligent Misrepresentation claim regarding the competence and skillset of the ACS Consultants.**

Erlanger also argues that ACS somehow negligently misrepresented the skills or competency of ACS before deploying that staff to work at Erlanger (Negligent Misrepresentation, Count IV). Erlanger devotes an entire section of its Response to defending this claim, which essentially asserts that the ultimate performance of the contract revealed that ACS must have been negligent in its pre-contract representations about the skill and competence of its employees. (Response at 24-27). Yet, these arguments actually establish why Count IV is time-barred. Erlanger explains that from "Paragraphs 25 to 51, the Complaint extensively highlights, with particularity, the myriad ways that Defendants' representations proved false—including conduct that showed Defendants lacked the specialized skills and expertise they represented to have, and provided erroneous advice that ultimately harmed Erlanger." (Response at 26, citing to ¶¶ 29, 41 and 32-45 of the Complaint, all of which allege that Erlanger was aware of the purportedly actionable conduct at or around the time it occurred). Thus, based on its own allegations, by July 2006, Erlanger was already aware of the conduct alleged in support of its misrepresentation claim.

Again, the "discovery rule" does not toll the running of the statute of limitations on a party's claim until the harm is incurred or realized; the limitation period is only tolled until the party knew or should have known about the conduct giving rise to the claim. *See Robinson*, 464 S.W.3d at 608. Given Erlanger's admitted knowledge no later than July 2006, Erlanger had until July 2009 to sue for negligent misrepresentation. That deadline expired three years before the

Tolling Agreement became effective and well before the Complaint was filed in 2016. Count IV should be dismissed as time-barred.

### 3. Claims Relating to Confidential Information and PHI.

Erlanger also makes much of the fact that in certain circumstances the discovery rule can apply to breach of contract claims. (Response, p. 18).[6] However, to the extent the discovery rule could apply to this case, it could *only* help the claims related to the purported theft of confidential information. The Complaint alleges that Erlanger *did not* know that ACS failed to protect its confidential information until the *qui tam* lawsuit was unsealed in 2012. (*See* Compl. ¶¶ 53-54). However, as explained in Section I, above, claims involving confidential information or PHI arise exclusively out of Whipple's conduct, as he is the only ACS employee who is alleged to have stolen that information, and the only harm alleged by Erlanger arising out of that theft is Whipple's use of the information in the *qui tam* action. (Compl. ¶¶ 51, 69). Erlanger does not dispute that it released Whipple in the Settlement Agreement or that all claims based on vicarious liability arising out of Whipple's conduct were also released. (Response at 4 - 8). Whether the discovery rule applies to save these claims is immaterial because Erlanger released all claims relating to Whipple's conduct.

### B. ERLANGER ALSO CANNOT RELY ON THE TOLLING AGREEMENT TO SAVE ITS TIME-BARRED AND NON-WHIPPLE CLAIMS.

Noticeably absent from Erlanger's Response is any detailed discussion of the Tolling Agreement. Instead, Erlanger glosses over the content of the Tolling Agreement inaccurately implying that it preserved every possible claim. The Tolling Agreement defines the term "Disputes" on the first page as follows:

> WHEREAS disputes relating to Mr. Whipple's conduct as part of the work performed for Erlanger by ACS under the Agreements, and actions taken with

---

[6] *See* FN 5, above regarding the limited applicability of the discovery rule for breach of contract.

respect to Erlanger by Mr. Whipple, whether based in contract or tort, that either Party may assert against the other are referred to here as the "Disputes".

(*See* Tolling Agreement, Doc. No. 1-3). The Tolling Agreement goes on to state that "[a]ll statutes of limitations, statutes of repose, and contractual periods of limitation which are or may be applicable to any Disputes, including applicable agreed upon dispute resolution mechanisms, are tolled beginning June 18, 2012." (*Id.*).

Thus, the Tolling Agreement is much narrower than described by Erlanger in two important ways. First, the Tolling Agreement only preserves claims "that either Party may assert against the other" as of the Effective Date. Indeed, the agreement is clear that tolling began on June 18, 2012. The agreement does not reach back in time and revive claims that were *already* time-barred as of the date the agreement was signed. Because the majority of Erlanger's claims were time-barred years before the Tolling Agreement was signed (as explained above), the Tolling Agreement does not save those claims.

Second, the Tolling Agreement only covers claims "relating to Mr. Whipple's conduct" and "actions taken with respect to Erlanger by Mr. Whipple." The Tolling Agreement did not generally preserve any direct claims against ACS based on non-Whipple activities, such as the alleged misrepresentations during the formation of the Agreements or ACS's general protection of Erlanger's confidential and proprietary information. Importantly, all of the conduct alleged in the Complaint occurred during Whipple's tenure at Erlanger – before July 2006. Thus, all of Erlanger's claims *not* specifically relating to or arising out of Whipple's conduct or actions are time-barred. Therefore, to the extent those claims were not already time-barred when the Tolling Agreement became effective (which, as explained in Section II.A.1-2, above, they were), the claims were not preserved by the Tolling Agreement and are now time-barred.

13

**III. ERLANGER DISREGARDS CASE LAW FROM WITHIN THE SIXTH CIRCUIT IN FAVOR OF A CONTRARY HOLDING FROM THE NINTH CIRCUIT IN SEEKING TO SHIFT ITS FCA LIABILITY TO ACS.**

Even if Erlanger's claims were not released (they were) and time-barred (they are), those claims should still be dismissed because they are dependent on Whipple's *qui tam* action and have the effect of offsetting Erlanger's FCA liability. In its Response, Erlanger attempts to persuade the Court to allow it to shift all the costs and expenses arising out of Whipple's *qui tam* lawsuit to Defendants because it settled with Whipple and the government, and thus can never be found "liable" for the FCA violations. In fact, Erlanger discusses at length case law from the Ninth Circuit, and argues that authority "governs," but ignores courts in other Circuits, including the Sixth Circuit, which have either disagreed with the Ninth Circuit or reached different conclusions.

First, while essentially ignoring the holding in *The Heart Doctors* (discussed below), Erlanger goes to great lengths to discuss the holding in *Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204, 1209 (9th Cir. 2009), including the District of Washington's decision on remand. (Response at 8-11). Erlanger further insists that the holdings from the Ninth Circuit (apparently including the decisions by the District of Washington on remand) "***govern** and are persuasive*" in this matter (*Id.* at 13, emphasis added), despite the contrary and undisturbed decision from a court in the Sixth Circuit. Indeed, other courts have rejected portions of the Ninth Circuit's ruling, for good reason. Specifically, in *United States ex rel. Battiata v. Puchaslski*¸ the District of South Carolina declined to follow the Ninth Circuit's decision in *Cell Therapeutics* "to the extent either would preclude dismissal of claims for dependent damages until after resolution of the *qui tam* claims." *United States ex rel. Battiata v. Puchalski,* 906 F. Supp. 2d 451, 460 (D.S.C. 2012). Instead, the court found "that dismissal should be denied only if a reasonable inference can be drawn that damages sought are independent.*" Id.* The *Battiata* court stated, that while "*the Ninth Circuit is free to interpret and modify its own opinions . . . [Cell Therapeutics'* reasoning] seems

14

contrary to the language in *Madden* which appears to suggest that even independent claims might be dismissed if they had the effect of indemnification or contribution." *Id.* at 458 and n.2 (emphasis added). Thus, the decisions from the Ninth Circuit and the District of Washington do not "govern" this matter and certainly carry no greater weight than an opinion from a district court within the Sixth Circuit deciding the same issue.

Second, Erlanger attempts to downplay the significance of one of the few opinions involving settlement of FCA claims, which also happens to be from a district court within this Circuit. (Response at 12, devoting less than eight lines to analysis of the case). In *The Heart Doctors, P.S.C.*, the *qui tam* defendant settled with the relator and the government and then sued Dr. Layne, the party the *qui tam* defendant claimed was responsible for FCA violations alleged in the *qui tam* action. *The Heart Doctors, P.S.C. v. Layne*, No. 6:05-636, 2006 WL 2692694, at *1 (E.D. Ky. Sept. 13, 2006). Like ACS, Dr. Layne was not the relator in the *qui tam* action, and was not a party to the settlement agreement. *Id.* While the opinion does not address the content of the settlement agreement resolving the *qui tam* action, the opinion notes that Dr. Layne admitted the billing violations. *Id.* Importantly, however, the settlement agreement attached to Dr. Layne's Motion for Summary Judgment states that "This Agreement is neither an admission of liability by the Respondents nor a concession by the United States that its claims are not well founded." *See The Heart Doctors,* Settlement Agreement, Case No. 6:05-CV-00636, ECF No. 10-5, attached hereto as Exhibit 1.[7] Dr. Layne answered the Complaint and then quickly moved for summary judgment, arguing that a *qui tam* defendant is not permitted to pursue claims that have the effect of offsetting FCA liability. *See The Heart Doctors,* Docket for Case No. 6:05-CV-00636, attached hereto as Exhibit 2. After a thorough analysis of the applicable case law regarding the limitations

---

[7] To assist the Court in its analysis of that case, true and accurate copies of the relevant documents filed of record in *The Heart Doctors* are attached to this Reply.

on shifting FCA liability, including to third-parties, the Eastern District of Kentucky dismissed the lawsuit. *The Heart Doctors,* 2006 WL 2692694 at *2 - 3.

Despite Erlanger's arguments to the contrary, *The Heart Doctors* is virtually indistinguishable from the present case. With no analysis, Erlanger first attempts to distinguish *The Heart Doctors* because the FCA defendant's claims were dismissed at the summary judgment stage instead of at the initial pleading stage. (Response at 12). This is merely a distinction without a difference. As can be seen from the docket for *The Heart Doctors,* the Motion for Summary Judgment was filed only two (2) months after the Answer. *See* Exhibit 2. The motion filed by Dr. Layne does not reference documents obtained through fact discovery, and only attached documents from the *qui tam* action. Moreover, the movant specifically explains that the motion is only styled as a Motion for Summary Judgment due to the injection of other documents from the *qui tam* matter. *The Heart Doctors, P.S.C., v. Layne*, No. 6:05-CV-636, 2006 WL 811082, ECF Nos. 9 - 10 (E.D. Ky. Feb. 10, 2006), a copy of which is attached hereto as Exhibit 3. As such, like the present case, that matter did not require factual development before the court could determine that the FCA defendant's claim sought improper indemnification of its liability under the FCA and should, therefore, be dismissed. *The Heart Doctors*, 2006 WL 2692694, at *3.

Erlanger next attempts to distinguish *The Heart Doctors* by arguing that the settlement agreement in that case "followed from an explicit admission of FCA liability by one of the Defendant's employees" (Response at 12), whereas Erlanger claims it "expressly denied all allegations and liability in the settlement agreement" (Response at 13, *citing* Compl. ¶¶ 55-56). This, too, is a distinction without a difference. As stated above, the settlement agreement in *The Heart Doctors* also states that such agreement is not an admission of liability. *See* Exhibit 1. This fact, however, did not appear to persuade the Eastern District of Kentucky in finding that the claims

against Dr. Layne solely sought to offset FCA *liability*. Indeed, despite the language in the settlement agreement, and no formal "finding of liability" (because, like Erlanger's matter, the underlying *qui tam* action ended in settlement), the Court in *The Heart Doctors* held as follows:

> Accordingly, ***having been found liable under the FCA,*** the Company may not now bring any claim against any party seeking to offset their FCA liability including any state law claims that, if prevailed, on would end in the same result.

2006 WL 2692694, at *3. Thus, while Erlanger takes the bold position settling the *qui tam* action means that its claims can never be dependent on a finding of FCA liability "because there has not been (and will not be) a finding of FCA liability against Erlanger stemming from the *qui tam's* allegations" (Response at 13), courts are not required to ignore the context of a settlement in determining whether a third-party claim seeks recovery that will have the effect of offsetting FCA liability.

Moreover, as explained above, the "explicit admission" was from the person accused of committing the FCA violation on behalf of The Heart Doctors. Erlanger's own Complaint includes comparable admissions regarding Erlanger's FCA liability. For example, in Paragraph 52 of the Complaint, Erlanger states that the *qui tam* Complaint alleged that Erlanger had "engaged in fraudulent billing *primarily based upon the billing initiative that he and ACS advocated and implemented over Erlanger's objections from late 2005 and into 2006.*" (Compl. ¶ 52, emphasis in original). The section in the Complaint immediately preceding this allegation describes Erlanger's observations of Whipple engaging in the conduct that Erlanger claims he alleged in the *qui tam* lawsuit, including complaints to hotlines by Erlanger's employees who evidently

witnessed the exact conduct that Whipple alleged in the *qui tam* action.[8]  Indeed, Erlanger is careful

to connect the allegations in the Complaint to the allegations at the heart of Whipple's *qui tam*

action. As such, Erlanger cannot set its case apart from *The Heart Doctors* by claiming "no

admission of liability" when the purported basis of this lawsuit is Erlanger's claim that Whipple

instructed Erlanger to engage in the wrongful conduct alleged in the *qui tam* action.

An additional similarity between the present matter and *The Heart Doctors* – also ignored

by Erlanger – is that the FCA defendant in that case also argued that "it ha[d] not asserted an

indemnification claim against Layne but instead assert[ed] a breach of contract claim." *Id.* The

Eastern District of Kentucky saw through this argument and held:

> In its Complaint, the Company seeks "[c]ompensatory damages for reimbursement
> of the amount required to refund the United States in the amount of $434,180" and
> "[c]ompensatory damages for attorney fees required to represent the plaintiffs for
> the defendant's fraud in the amount of $124,142.13." With its Complaint, the
> Company seeks indemnification for its liability under the FCA and, accordingly,
> the Complaint must be dismissed.

*Id.* at *2 - 3.   While, the FCA defendant in *The Heart Doctors* was more transparent than Erlanger

in its request for relief, the damages it sought are no different from the damages sought by Erlanger

in this matter.  Indeed, the only harm alleged by Erlanger is the cost of defending and settling the

*qui tam* action, for which it seeks reimbursement of from ACS.  (Compl. ¶ 56).  Moreover, as

outlined in the Complaint, the damages incurred as a result of the *qui tam* lawsuit are the only

---

[8] In Paragraph 26 of the Complaint, Erlanger specifically alleges that the alteration of the "patient status guidelines" was "in violation of Medicare billing requirements."  Likewise, in Paragraph 40, Erlanger alleges that "Whipple personally changed numerous observation patient accounts to inpatient status – often regardless of whether or not there was a physician order to support the change in status.  Whipple was not authorized to make these patient status changes independently."

possible damages that could arise out of the 10-year-old conduct alleged in the Complaint.[9] (*See* Doc. No. 8 at 12 - 13). Accordingly, the holding in *The Heart Doctors* demonstrates why Erlanger's claims should be dismissed.

## IV. ERLANGER'S NOTIFICATION TO ACS OF THE *QUI TAM* ACTION DOES NOT SAVE ITS INDEMNIFICATION CLAIM.

In the Response, Erlanger argues that indemnification is permitted here because its settlement with Whipple was in good faith. Erlanger further argues that it placed ACS on notice of the claims around the time they arose, and that notice is sufficient under Tennessee law. (Response at 14 - 17). These arguments do not save Erlanger's indemnification claim.

As Erlanger acknowledges, in Tennessee, where the indemnification provision provides the indemnitor the right to control the defense, for a judgment to be binding on an indemnitor, it must be afforded the "full opportunity to defend." *In re Pro Page Partners, LLC*, No. 00-22856, 2007 WL 1557207, at *8 (Bankr. E.D. Tenn. May 25, 2007) (cited by Erlanger). As explained in *Pro Page Partners,* the "full opportunity to defend" includes "the concept that the indemnitor be advised in some fashion that the *indemnitee seeks to hold him liable* under the indemnity agreement such that the indemnitor is placed on constructive notice that the failure to offer a full and complete defense may result in the finding of liability against him, the same as if he had been the original

---

[9] At no point does Erlanger attempt to explain why it waited until after Whipple filed – and Erlanger later settled – the *qui tam* action before suing Defendants. If Erlanger's claims were truly independent of the FCA liability, it certainly would not have waited ten years to sue ACS for the conduct Erlanger admits it knew about in 2006. Indeed, this delay demonstrates the dependency of Erlanger's current claims on its FCA liability. But for Whipple's *qui tam* lawsuit, and the defense and settlement costs associated with that action, Erlanger would not have been harmed, but instead enriched by the conduct it now raises in the Complaint. However, now that Erlanger has had to pay back a portion of the proceeds wrongfully obtained in reimbursement from the government, it seeks to refill its coffers with ACS's funds. By way of analogy, Erlanger's argument is no different than a thief who was advised to steal money, elected to repay some portion of what he stole, then demands that his advisor reimburse him for the money he had to repay to its rightful owner.

19

defendant." *Id.* (emphasis added). Absent this "full opportunity to defend or participate in the defense," a judgment against the indemnitee will not be binding on the indemnitor in a subsequent action. *Id.* Against that background, the Court found "full opportunity to defend or participate" after a deep analysis of the evidence regarding communications between counsel for the indemnitee and indemnitor, which (1) included multiple e-mails, (2) showed that the indemnitor was represented by counsel during the pendency of the first lawsuit, (3) his counsel worked with the indemnitee's counsel throughout the litigation and was involved in some ways in the defense of the suit, and (4) the attorneys discussed the indemnification agreement. *Id.* at *3-4.

In this case, the MSA requires prompt notice and action to avoid default until the notified party can "assume the defense of the claim" and that the notified party has the "the right to select counsel and to control such defense." (*See* Doc. No. 1-2 at 14 of 22). Similarly, the Addendum required Erlanger to notify ACS about a claim, permit ACS to assume sole authority to conduct the trial and settle the case, and cooperate with ACS's defense of the case. (*See id.* at 9 of 22). Erlanger does not allege or even argue that it afforded ACS that opportunity.

In stark contrast to the evidence presented in *Pro Page Partners,* Erlanger points to one letter in claiming that ACS was afforded the "full opportunity" required under Tennessee law. The June 2012 Letter from Erlanger's counsel (Doc. No. 7-3) asked ACS to do six specific things, none of which involved indemnification or assuming defense of the Whipple *qui tam* action. (Doc. No. 7-3). The letter focused on confirming ACS's efforts to protect against disclosure of Erlanger's PHI. It makes no reference to indemnification under the MSA and only mentions indemnification under the Addendum. (*Id.*). Yet, the Addendum's indemnification provision only requires indemnification for "non-permitted or violating use or disclosure of PHI." (*Id.*). However, the only use of the PHI known at the time of the June 2012 Letter was its use in Whipple's *qui tam*

action (*see id.*), which is protected conduct under federal law and public policy. *See e.g., United States ex. rel Cieszynski Lifewatch Serv., Inc*., No. 13-CV-4054, 2016 WL 2771798, at *3-4 (N.D. Ill. May 13, 2016) (dismissing a counterclaim against a relator because public policy protected relators who use PHI for the purpose of pursing the *qui tam* claim).[10]  Thus, notifying ACS only of its potential indemnification obligation regarding *protected use of PHI* certainly does not put ACS on notice that Erlanger intends to hold it liable under the MSA's indemnification provision if it does not provide a full and complete defense of Whipple's claims.  In fact, the specific omission of a reference to indemnification under the MSA (while specifically addressing the indemnification provisions in the Addendum) communicates an intent by Erlanger *not* to invoke such potential indemnification obligations.  As such, Erlanger did not satisfy the contractual steps required to invoke indemnification relating to the *qui tam* action.

Erlanger relies on *Murray Ohio Mfg. Co. v. Shimano Am. Corp.*, No. 90-5142, 1991 WL 209476, at *5 (6th Cir. Oct. 17, 1991), for the proposition that because ACS did not specifically argue that Erlanger's settlement was not made in "good faith," it is exempt from its obligation to obtain "knowledge and approval" from the indemnitor as required in *Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 405 (6th Cir. 1998) (cited by ACS in Doc. No. 8 at p. 22).  However, what Erlanger fails to observe is that the issue of whether the settlement was voluntary or not only arose *after* counsel for Murray and Sears (defendants in the underlying suit) specifically demanded that Shimano "indemnify them pursuant to an agreement between Murray and Shimano," which Shimano refused to do with respect to Sears. *Id.* at *1.  As a result, Murray incurred expenses

---

[10] Erlanger's Complaint only alleges the PHI was used in connection with the *qui tam* (Compl. 53, 57), and based on the assurances provided by Whipple in the Settlement Agreement, no other use occurred. (Doc. No. 7-2 at ¶ 20).  Erlanger cannot seek indemnification for damages arising solely out of Whipple's protected use of its PHI in the *qui tam* action.  Erlanger has not plead facts to support another basis for an indemnity claim under the Addendum.

defending and indemnifying Sears in the ultimate settlement of the matter. *Id.* Thus, in that case, the indemnitor was indisputably afforded "full opportunity" to defend and had simply rejected it.

Unlike *Murray Ohio,* Erlanger did not make a clear demand to have ACS defend and indemnify it in the *qui tam* action. Instead, Erlanger's extremely limited communication about the action focused on protection of confidential information and PHI, never even mentioning the MSA's indemnification provisions — likely so that it could retain control of the action instead of surrendering it to ACS. Accordingly, because Erlanger never communicated its intent to hold ACS liable for its defense and eventual settlement in Whipple's *qui tam* action pursuant to the MSA's indemnification provision, *i.e.,* afford it the "full opportunity to defend and participate in the action", ACS cannot now be obligated to pay the settlement that was indisputably agreed upon without ACS's "knowledge and approval".

In short, under the MSA, Erlanger cannot have it both ways. Because Erlanger elected to defend the Whipple lawsuit without relinquishing control to ACS in 2012, settle that lawsuit, and incur liability for both defending and paying the settlement amount, Erlanger cannot now have ACS reimburse it for a settlement it kept hidden from ACS — a settlement that simply returned monies Erlanger previously received from the government.

## V.     ERLANGER'S CLAIMS AGAINST XEROX ARE NOT SUFFIICENTLY PLED.

Xerox moved to dismiss all claims against it in this action because Erlanger failed to allege (1) that Xerox engaged in any of the conduct at issue; or (2) any facts to support piercing the corporate veil between ACS and Xerox. (*See* Doc. No. 8). In response, Erlanger does not identify any allegations of conduct by Xerox, nor does it identify allegations that would justify piercing the corporate veil between Xerox and ACS other than the single allegation that Xerox was the sole member of ACS. (*See* Doc. No. 14 at 30). Erlanger also argues that Xerox assumed the liabilities of ACS. (*Id.* at 31). Erlanger's arguments fail for two reasons.

Before addressing those reasons, it is important to ground the discussion in black-letter law governing corporate distinctions, a process Erlanger seems to ignore.[11]  According to Erlanger's Complaint, Xerox is a New York corporation[12] and is the sole member of ACS, a limited liability company located in Texas.  (Doc. No. 1 ¶¶ 2-3).  "Parent and subsidiary corporations 'are generally presumed to be separate and thus parent corporations are not liable for the acts of their subsidiaries.'  However, direct liability can be imputed to a parent entity as a result of the parent's control over a subsidiary. . . . [when it can be shown that] the parent corporation's domination of the subsidiary was so complete as to make them practically indistinguishable or to make the subsidiary a mere tool, agency or instrumentality of the parent. . . ."  *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *5 (Tenn. Ct. App. Feb. 24, 2009) (internal citations omitted).  Erlanger's Complaint is void of any allegations concerning Xerox's control of ACS.

Turning to this case, Erlanger's Complaint included a single allegation upon which it bases its claims against Xerox: that Xerox is the sole member of ACS.  (*See* Doc. No. 1 ¶ 3).  Yet, Erlanger now appears to argue that Xerox should remain as a defendant because it assumed (unidentified) liabilities of ACS.  Specifically, Erlanger asserts that the 2010 Xerox 10-Q filing referenced in Xerox's Memorandum somehow establishes that Xerox assumed all liabilities of ACS in 2010 by pointing to two statements in that filing.  (Doc. No. 14 at 31).  In fact, that

---

[11] In addition to blurring the lines between Xerox and ACS, Erlanger also ignores the corporate distinction between Affiliated Computer Services, Inc. — the entity acquired by Xerox in 2010 — and ACS Consultant Company, Inc., the entity with which Erlanger contracted in 2005 and 2006. Neither Erlanger's Complaint nor its Response attempts to address that corporate distinction.

[12] Under New York law, a member of a limited liability company is not liable for the liabilities of the company "whether arising in tort, contract or otherwise, solely by reason of being such member." N.Y. Limited Liability Companies Law § 609 (2015); *see also* Tenn. Code Ann. § 47-249-114(a)(1)(A) (same).

statement merely confirms that Xerox (1) "assumed liabilities due under contractual change-in-control provision is in ***employment agreements*** of certain ACS employees and its Chairman . . ."; and (2) assumed certain "contractual obligations and commercial commitments," such as "long-term debt, including capital lease obligations," "minimum operating lease commitments," "surety bonds," and "letters of credit." (Xerox 10-Q at 15, link provided at Doc. No. 10 at 4 n.2 & 47) (emphasis added). Nowhere in the 10-Q does Xerox list the Erlanger/ACS Consultant Company contracts at issue in this lawsuit. Perhaps this explains why Erlanger merely asserted generally that Xerox assumed "a range of ACS's liabilities"; Erlanger does not plead and cannot otherwise establish from the pleadings that Xerox assumed liability for the contracts at issue.

Accordingly, the Court is left with the Complaint, which does not allege assumption of liabilities or assert that Xerox engaged in any conduct; it merely alleges that Xerox is the sole member of ACS. That fact alone fails to state claims against Xerox for which relief can be granted. *See Jenkins v. Marvel*, 683 F. Supp. 2d 626, 630-31 (E.D. Tenn. 2010) (dismissing claims against parent corporation under Rule 12(b)(6) because the plaintiff alleged only ownership, but no other facts that would support liability under any theory); *McConkey v. McGhan Med. Corp.*, 144 F. Supp. 2d 958 (E.D. Tenn. 2000) (dismissing claim against parent company on summary judgment when the only connections between the parent and subsidiary were ownership and a parent-to-subsidiary loan).

Finally, Erlanger argues that it is not required to plead fraud in order to pierce the veil between ACS and Xerox. Erlanger cites *Smith v. Music City Homes, LLC*, No. 3:12-CV-0681, 2012 WL 4849896 (M.D. Tenn. Oct. 11, 2012) for the proposition that piercing involves a "multi-factorial approach." (Response at 30). Indeed, the *Smith* opinion set forth eleven factors to consider, but Erlanger addresses only one of those factors: ownership. (*Id.*). Erlanger fails to point

to any allegations in the Complaint that even address the other ten factors.[13]  Moreover, Erlanger can never allege facts regarding Xerox's direct involvement in the negotiation or performance of the ACS agreements, nor can it allege facts that relate to any of the other ten factors relevant to piercing the veil between ACS and Xerox, because, as is evident in Xerox's 10-Q filing that Erlanger embraced in its Response, Xerox had absolutely no affiliation with ACS until four years after the relevant time-period.

Because ownership of a company alone cannot support claims against the parent company absent allegations of conduct by that parent company or facts that would support piercing through the corporate distinction, Erlanger's claims against Xerox should be dismissed.

## VI.   CONCLUSION.

For the foregoing reasons and those stated in the Defendants' previous filings, the Court should dismiss Erlanger's claims against ACS and Xerox for failure to state a claim upon which relief can be granted.

---

[13] The other ten factors are: "whether there was a failure to collect paid in capital; whether there was a failure to collect paid in capital; whether the corporation was grossly undercapitalized; the nonissuance of stock certificates; the use of the same office or business location; the employment of the same employees or attorneys; the use of the corporation as an instrumentality or business conduit for an individual or another corporation; the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; the use of the corporation as a subterfuge in illegal transactions; the formation and use of the corporation to transfer to it the existing liability of another person or entity; and the failure to maintain arms length relationships among related entities."  *Smith*, 2012 WL 4849896, at *5.

Case 1:16-cv-00496-TWP-CHS   Document 18   Filed 03/01/17   Page 25 of 26   PageID #: 340

Respectfully submitted,

s/ William L. Campbell, Jr.
William L. Campbell, Jr. (BPR 022712)
Tonya J. Austin (BPR 033771)
Carl Eppler (BPR 31112)
FROST BROWN TODD LLC
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
615.251.5550 Telephone
615.251.5551 Facsimile
ccampbell@fbtlaw.com
taustin@fbtlaw.com
ceppler@fbtlaw.com

*Counsel for Defendant Xerox Corporation,
Xerox Business Services, LLC, f/k/a Affiliated
Computer Services, Inc., which owned ACS
Consultant Company, Inc., d/b/a ACS
Healthcare Solutions*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 1st day of March, 2017, the foregoing was filed electronically and served upon all registered users of the Electronic Case Filing System, including:

Brian D. Roark
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
*Counsel for Plaintiff*

s/ William L. Campbell, Jr.

0125009.0597375 4851-8463-1619v6