UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

CHATTANOOGA-HAMILTON )
COUNTY HOSPITAL AUTHORITY, )
d/b/a ERLANGER MEDICAL CENTER )
and ERLANGER HEALTH SYSTEM, )
)
        Plaintiff, )
)
v. )    No. 1:16-cv-496
)    Judge Phillips
XEROX CORPORATION; XEROX )
BUSINESS SERVICES, LLC, f/k/a )
AFFILIATED COMPUTER )
SERVICES, INC., d/b/a ACS, )
)
        Defendants. )

## MEMORANDUM OPINION

This civil action is before the Court on two pending motions to dismiss: the motion to dismiss [Doc. 7] filed by defendant Xerox Business Services, LLC ("XBS"), f/k/a Affiliated Computer Services, Inc., which owned ACS Consultant Company, Inc., d/b/a ACS Healthcare Solutions ("ACS"); and the motion to dismiss [Doc. 9] filed by defendant Xerox Corporation ("Xerox"). The parties have filed briefs in support of and in opposition to the pending motions [Docs. 8, 10, 14, 18, 27, 28], which the Court has carefully reviewed.

After considering the pending motions, defendant XBS's motion to dismiss [Doc. 7] will be **GRANTED in part** and **DENIED in part** and defendant Xerox's motion to dismiss [Doc. 9] will be **GRANTED**.

# I.    Relevant Facts[1]

This case arises from a contract for services between plaintiff Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Medical Center and Erlanger Health System ("Erlanger") and ACS in 2005 and 2006 [Doc. 1 at ¶10]. Subsequent to the events at issue, defendant Xerox acquired ACS [*Id.* at ¶ 4].

Following the settlement of a prior civil suit under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, Erlanger contracted with ACS to improve its billing and other financial practices [*Id.* at ¶¶ 9—11]. In December 2005, Erlanger and ACS entered into a Service Agreement and then into a Master Service Agreement ("MSA") on January 25, 2006 (collectively the "Agreement") [*Id.* at ¶ 10]. Under this Agreement, ACS agreed to provide Erlanger with "consultants, managers, technical personnel, and other personnel to furnish healthcare information technology, strategic, financial and operations management consulting services, and computer program development services" who would work at Erlanger [*Id.* at ¶ 13]. During the term of this Agreement, ACS and its employees had the authority to assume almost complete control of specific areas of Erlanger's operations and ACS was authorized to appoint its own employees to leadership positions at Erlanger [*Id.* at ¶ 14]. Thus, ACS employees essentially controlled or exerted significant influence upon Erlanger's financial operations, its revenue cycle, its employment and staffing, and its

---

[1]For the purposes of a motion to dismiss, the Court takes the factual allegations in the complaint [Doc. 1] as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint").

clinical resource management programs [*Id*. at ¶ 15]. However, all of the ACS consultants working at Erlanger remained employees or subcontractors of ACS [*Id*. at ¶ 16].

In order to perform the services provided for under the Agreement, ACS and its employees were given access to sensitive, confidential, and proprietary information, including patient and financial information [*Id*. at ¶ 19]. Accordingly, the Agreement required ACS to hold any proprietary information it received from Erlanger "in confidence;" to "exercise reasonable care to protect it;" and to take affirmative actions to guard against its disclosure and misappropriation [*Id*. at ¶ 20]. ACS agreed that its work would "be performed in a workmanlike and professional manner consistent with the level of care and skill ordinarily exercised by providing similar services under similar conditions" [*Id*. at ¶ 21]. ACS further agreed that it would indemnify and hold Erlanger harmless "from and against any third-party claims for loss, damage, expense (including attorneys' fees) liability … caused by the negligent acts or omissions of the indemnifying party, its employees, agents or subcontractors …" [*Id*. at ¶ 22].

Erlanger and ACS entered into a Business Associate Addendum to the Agreement which required ACS "to return to [Erlanger] or destroy all PHI ["Protected Health Information"], in whatever form or medium" under ACS's control "as promptly as possible, but not later than 30 days after the effective date of the termination, cancellation, expiration, or other conclusion" of the agreement [*Id*. at ¶ 23]. The Addendum also imposed indemnification obligations upon ACS for "any claim, cause of action, liability, damage, cost or expense, including attorneys' fees and court or proceedings costs," arising

out of or connection with any "breach of this Addendum by ACS or any subcontractor, agent, person or entity under ACS's control" [*Id.* at ¶ 24].

ACS's work at Erlanger lasted from November 2005 through at least December 2006 [*Id.* at ¶ 25]. In December 2005, ACS hired Robert Whipple as a revenue cycle consultant for the Erlanger contract [*Id.* at ¶ 26]. In February 2006, Whipple was named Erlanger's Director of Utilization Review/Case Management and he remained in this position until he was removed in July 2006 [*Id.*]. Erlanger claims that Whipple and ACS pressured Erlanger to bill fewer observation claims and more inpatient claims in order to increase revenue [*Id.* at ¶ 28].[2] ACS did this by directing the rebilling of a larger number of observation claims from 2004-2005 as inpatient claims; altering patient status guidelines for Erlanger's utilization review staff; and changing the patient status in certain patient records from observation to inpatient, regardless of whether the change was supported by a physician order and in violation of Medicare billing requirements [*Id.* at ¶ 29].

Erlanger alleges the following specific incidents:

- In December 2005, Whipple requested billing data for all observation services and short-stay inpatient admissions for May 2004 through October 2005 and he directed that 143 claims previously billed as "observation" claims should be rebilled as inpatient stays [*Id.* at ¶ 32].

---

[2]Erlanger states that health insurance companies reimburse hospitals at different levels based on patient status with inpatient services typically reimbursed at higher rates than outpatient or observation services [Doc. 1 at ¶ 28, n.1].

- On December 21, 2005, Whipple met with Erlanger managers and stated that Erlanger should not be putting any Medicare patients in observation status and that "emergent" admissions and surgeries should always be billed as inpatient claims [*Id*. at ¶ 33].

- In January and February 2006, ACS instituted changes to the patient status guidelines to increase the amounts billed by Erlanger [*Id*. at ¶ 34].

- On February 1, 2006, ACS consultants directed Erlanger's Patient Financial Services ("PFS") Department to rebill as inpatient claims the observation claims previously identified by ACS [*Id*. at ¶ 36].

- In mid-February 2006, ACS advised the Erlanger Board of Trustees that rebilling the 700-plus historical observation records as inpatient claims would produce $4.99 million in revenue for Erlanger and an additional $3.32 million moving forward [*Id*. at ¶ 38].

- Erlanger then requested that ACS not rebill any more observation claims until ACS had met with Erlanger's fiscal intermediary to discuss the propriety of ACS's billing directives [*Id*. at ¶ 39].

- Starting in early February 2006, Whipple reviewed the observation charts daily and personally changed numerous observation patient accounts to inpatient status without physician authorization [*Id*. at ¶ 40].

- In March 2006, Erlanger staff began flagging the records reviewed by Whipple in order to document the Health Information Management's disagreement with the ACS billing and patient status directives [*Id*. at ¶ 41].

- On May 1, 2006, an Erlanger employee called Erlanger's internal compliance hotline to complain about Whipple's billing recommendations. From May to July 2006, Erlanger's Chief Compliance Officer and staff met on multiple occasions to review accounts where Whipple had changed the patient status from observation to inpatient without a physician order [*Id*. at ¶ 43].

- In June 2006, Erlanger's Chief Compliance Officer informed employees to call the compliance hotline or notify Erlanger Leadership directly and immediately if they saw accounts where Whipple made status changes [*Id*. at ¶ 44].

- On July 12 and 16, 2006, the internal compliance hotline received complaints that Whipple had changed patient statuses without a physician order [*Id*. at ¶ 45].

- Whipple was removed from the Erlanger engagement in late July 2006, and he kept PHI and confidential documents belonging to Erlanger [*Id*. at ¶¶ 49, 51].

On March 7, 2011, Whipple filed a qui tam complaint against Erlanger in the United States District Court for the Middle District of Tennessee [*Id*. at ¶ 52]. Whipple alleged that Erlanger violated the FCA by submitting fraudulent reimbursement claims to Medicare and Medicaid for medically unnecessary inpatient and observation services during the period he worked for ACS at Erlanger [*Id*.]. These allegations were based upon confidential documents, data, and other information that Whipple obtained from Erlanger [*Id*. at ¶ 53]. The United States and the states of Tennessee, Georgia, and North Carolina

declined to intervene in the lawsuit, but Whipple pursued the claims on his own [*Id.* at ¶¶ 54—55]. The parties settled the lawsuit in July 2016 and the case was dismissed. As part of the settlement, the parties signed a settlement agreement and release [*Id.* at ¶ 56; Doc. 7, Ex. 2].

Following a June 18, 2012 letter from Erlanger's counsel to ACS's counsel, the parties negotiated and executed a Tolling Agreement [Doc. 1, Ex. C] relative to disputes that had arisen between the parties, including alleged breaches of the service agreements [Doc. 1 at ¶¶ 57—60]. Therein, the parties agreed to toll the statutes of limitations, statutes of repose, and contractual periods of limitation and preserve any claims or defenses arising from "disputes relating to Mr. Whipple's conduct as part of the work performed for Erlanger by ACS under the Agreements, and actions taken with respect to Erlanger by Mr. Whipple" effective June 18, 2012 [*Id.* at ¶ 61, Ex. C]. Erlanger terminated the Tolling Agreement on November 14, 2016 [*Id.* at ¶ 63] and this action followed. Erlanger asserts claims for: (1) breach of contract; (2) breach of warranty; (3) breach of fiduciary duties; (4) negligent misrepresentation; (5) negligence; and (6) indemnification [*Id.* at ¶¶ 64—111].

## II.     Standard of Review

Federal Rule of Civil Procedure 8(a)(2) sets out a liberal pleading standard, *Smith v. City of Salem*, 378 F.3d 566, 576 n.1 (6th Cir. 2004), requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the [opposing party] fair notice of what the . . . claim is and the grounds upon which it rests,'"

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Detailed factual allegations are not required, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do," nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In deciding a Rule 12(b)(6) motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires th[is Court] to draw on its judicial experience and common sense." *Id.* at 679.

### III. Analysis

#### A. Xerox's Motion to Dismiss [Doc. 9]

Xerox is the parent corporation of XBS. Xerox has moved to dismiss the claims against it because Erlanger fails to allege any facts by which Xerox can be liable for the

conduct alleged in the complaint. Indeed, the only allegations in the complaint against Xerox are as follows:

- Xerox is a New York corporation with a principal place of business in Norwalk, Connecticut and Xerox has done business within Hamilton County, Tennessee [Doc. 1 at ¶ 2].

- Xerox is the sole member of XBS [*Id*. at ¶ 3].

- Xerox acquired ACS, which provided healthcare consulting services to Erlanger prior to the acquisition by Xerox, and those services are the subject of this case [*Id*. at ¶ 4].

The complaint contains no other allegations or even mention of Xerox, although plaintiff refers collectively to "Defendants" in the prayer for relief [Doc. 1 at p. 21].

Xerox argues that it should be dismissed from this case because Erlanger has not alleged any facts or claims directly against Xerox or any alter-ego basis for liability [Doc. 10 at p. 2—4]. Xerox also notes that it did not purchase ACS until February 2010, years after the events alleged in the complaint [*Id*. at p. 4, n.2]. In response, plaintiff argues that two of the factors to be considered in piercing the corporate veil are the "sole ownership of stock by one individual" and the "use of the corporation as an instrumentality or business conduit for an individual or another corporation" [Doc. 14 at p. 30].[3] Plaintiff notes that it has alleged that Xerox is the sole member of XBS, which acquired ACS, and that the details

---

[3]Xerox has supplied the information related to its purchase of ACS by way of the Form 10-Q filed with the United States Securities and Exchange Commission for the quarterly period ending September 30, 2010. Erlanger concurs in Xerox's request for the Court to take judicial notice of this report.

of the acquisition of ACS, as disclosed in Xerox's Form 10-Q, show that there are questions as to whether XBS was "an instrumentality or business conduit" for Xerox [*Id*. at p. 31]. In reply, Xerox notes that its assumption of certain liabilities in the acquisition of ACS does not establish that Xerox assumed liability for the contracts at issue in this case [Doc. 18 at pp. 22—25]. Further, Xerox notes that the complaint contains no allegations of Xerox's control of ACS, its involvement in the negotiation or performance of the contracts at issue, or any other factors related to piercing the corporate veil [*Id*.].

It is well settled that a corporation is treated as a separate entity, unless there is a "showing that the corporation is a mere sham or dummy." *McConkey v. McGhan Med. Corp.*, 144 F. Supp. 2d 958, 962 (E.D. Tenn. 2000) (citing *Post Sign Co. v. Jemc's, Inc.*, 342 S.W.2d 385, 390 (Tenn. Ct. App. 1960)). The Tennessee Supreme Court has articulated a three-part test to determine whether a corporation was a mere instrumentality of another corporation and therefore whether piercing the corporate veil is warranted, as follows:

1. The parent corporation, *at the time of the transaction complained of*, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, has no separate mind, will or existence of its own.

2. Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Continental Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979) (emphasis added). There are also additional factors to be considered in whether to pierce the corporate veil, as noted in plaintiff's brief [Doc. 14 at p. 30], *Smith v. Music City Homes, LLC*, No. 3:12-cv-0681, 2012 WL 4849896, at *5 (M.D. Tenn. Oct. 11, 2012), and *Fed. Deposit Ins. Corp. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984). "The party wishing to negate the existence of separate legal entities has the burden of proving facts sufficient to justify piercing the corporate veil." *McConkey*, 144 F. Supp. 2d at 963; *JLC Beechtree, Inc. v. A&E Healthcare of Tenn., LLC*, No. 3:10-CV-523, 2012 WL 1890359, at *4 (E.D. Tenn. May 23, 2012).

Accepting the facts alleged in the complaint as true, plaintiff has alleged nothing more than that Xerox is the parent corporation of XBS, which previously did business as ACS. Plaintiff has alleged no facts regarding any actions that Xerox took or failed to take regarding the events described in the complaint; thus, plaintiff has not alleged any type of direct liability by Xerox. Further, plaintiff has alleged no facts to show that Xerox is the alter ego of ACS such that their activities are intertwined. Indeed, it is unclear how Xerox could have exercised dominion over ACS "at the time of the transaction complained of" inasmuch as Xerox did not acquire ACS until years after the events at issue. In short, there are simply no facts in the complaint that would give rise to some potential liability of Xerox. In the absence of such facts, the Court cannot assume that Xerox *may* be liable simply because of its current corporate affiliation with XBS. Accordingly, the Court finds that plaintiff has failed to assert a plausible claim for relief against Xerox and Xerox should be dismissed from this case.

B.    ACS's Motion to Dismiss [Doc. 7]

    1.    Whether Erlanger Has Released All Claims Against ACS

ACS first argues that Erlanger released all potential claims against ACS when it settled all claims by and against Whipple.  In support of this argument, ACS notes that, per the settlement agreement, Erlanger released all claims against Whipple for the same conduct for which Erlanger now sues ACS and Whipple is the only ACS consultant named in the complaint.  ACS contends that Erlanger's settlement of claims against ACS's agent, Whipple, extinguished any claims against ACS [Doc. 8 at pp. 8—10].

In response, Erlanger contends that its claims against ACS are based on direct liability and are independent of any claims Erlanger had against Whipple [Doc. 14 at pp. 4—8].  Erlanger correctly notes that Whipple was not a party to the Agreement between Erlanger and ACS and therefore he did not owe the same contractual duties to Erlanger as ACS did.  Erlanger distinguishes the cases relied upon by ACS as involving claims based "solely on vicarious liability," unlike the instant case [*Id.*].

In reply, ACS reiterates that allegations of the complaint show that Whipple was the "sole source of the conduct" and all allegations trace back him [Doc. 18 at pp. 3—4].  Regarding Erlanger's position that the claims are "direct" and not "vicarious," ACS argues that a corporation can function only through its agents and employees [*Id*. at p. 5].  Further, ACS argues that Whipple is the only person who allegedly failed to protect confidential information and PHI and the only alleged harm from this theft is that it formed the basis of Whipple's qui tam action [*Id*. at p. 5—6].

ACS relies on *Lavoie v. Franklin Cty. Pub. Co.*, No. M2010-02335-COA-R9-CV, 2011 WL 1884562 (Tenn. Ct. App. May 17, 2011) for the proposition that Erlanger's release of all claims against Whipple, as an agent of ACS, also released any claims against ACS for the same conduct. *Lavoie* states the blackletter law principle that "a plaintiff is not permitted to pursue a claim against a principal based solely on vicarious liability when the plaintiff has settled with the agent and thereby released the agent from liability." *Id*. at *3. The settlement agreement between Erlanger and Whipple released Whipple from any claims "that arise from or are related to: (a) the Covered Conduct; (b) the Litigation; or (c) [Whipple's] tenure at Erlanger" [Doc. 7-2 at ¶ 10].[4]

Certainly, much of the complaint alleges misconduct by Whipple individually [*see, e.g.*, Doc. 1 at ¶¶ 31—33, 40, 45]. However, Erlanger has also alleged misconduct by ACS and ACS consultants [*see, e.g., Id.* at ¶¶ 29—30, 34, 36—37, 39]. Although ACS complains bitterly that the complaint does not identify any individual other than Whipple, this deficiency does not necessarily make the complaint implausible because these unknown individuals are not named as defendants. *Cf. Joslin v. Metro Nashville/Davidson Cty.*, No. 3:12-cv-1284, 2013 WL 2250712, at *6 (M.D. Tenn. May 21, 2013) (plaintiffs must clarify allegations against police officers named as defendants). Thus, whether Erlanger can support its claims against ACS based on facts other than Whipple's released conduct remains to be seen. Construing the complaint in the light most favorable to the

---

[4]The settlement agreement defines "Covered Conduct" as "[a]ll conduct and claims alleged" in the original complaint and amended complaint in the FCA litigation [Doc. 7-2 at p. 2].

plaintiff, the Court cannot conclude at this juncture that all of Erlanger's claims are "based solely on vicarious liability."

Moreover, the settlement agreement states that the parties [Erlanger and Whipple] "are not releasing ACS or any related entities; nor do any of the released claims contained in this Agreement include any claims that any Party to this Agreement may wish to assert against ACS or any related entities" [*Id*. at ¶ 12]. Further on, the settlement agreement provides that "[t]his section shall not limit Erlanger's ability to assert claims against ACS or any related entities" [*Id*. at ¶ 19]. Although ACS suggests that these provisions are "legally irrelevant" and "ineffective" [Doc. 8 at p. 10], the Court disagrees. In the Court's view, these provisions settle the issue and the Court does not find, on the present record, that Erlanger has released its claims against ACS.

### 2.     Whether Erlanger Has Pled a Viable Basis for Damages

The Court next considers the parties' opposing arguments as to the effect of a trilogy of cases from the Ninth Circuit Court of Appeals on an issue that the parties acknowledge the Sixth Circuit has not addressed. In *Mortgages, Inc. v. United States Dist. Ct. for Dist. of Nev.*, 934 F.2d 209 (9th Cir. 1991), the Ninth Circuit concluded that "Congress did not intend to create a right of action for contribution or indemnification under the FCA" and no such right was found in federal common law. *Id.* at 213—214. Thus, the court concluded there was no right to assert state law counterclaims that would have the same effect of contribution or indemnification. *Id.* at 214. Relying primarily on *Mortgages*, ACS argues that Erlanger, as a former FCA defendant, cannot seek contribution or indemnification from ACS for costs incurred in defending and settling the qui tam action

[Doc. 8 at pp. 10—13].  Because the instant complaint only alleges harm arising from Whipple's FCA action, ACS argues that Erlanger's claims are not cognizable.

In *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827 (9th Cir. 1993), the Ninth Circuit refined the rule from *Mortgages* and explained it as follows:

> The decision in *Mortgages* is designed to prevent qui tam defendants from offsetting their liability.  Counterclaims for indemnification or contribution by definition *only* have the effect of offsetting liability.  Counterclaims for independent damages are distinguishable, however, because they are not dependent on a qui tam defendant's liability.

*Id*. at 830—31 (emphasis in original).  In allowing qui tam defendants to bring counterclaims for independent damages, the court suggested that resolving the issue of the qui tam defendant's liability before reaching the counterclaims would prevent parties from doing "an end run around *Mortgages*."  *Id*. at 831.  "If a qui tam defendant is found liable, the counterclaims can then be dismissed on the ground that they will have the effect of providing for indemnification or contribution.  On the other hand, if a qui tam defendant is found not liable, the counterclaims can be addressed on the merits."  *Id*.

Erlanger argues that the most analogous authority is *Cell Therapeutics, Inc. v. Lash Group, Inc.*, 586 F.3d 1204 (9th Cir. 2010), in which a qui tam defendant settled with the government and the relator and then pursued claims against a third party.  After reviewing *Mortgages* and *Madden*, the Ninth Circuit concluded, "a settlement agreement under the FCA should not, absent specific and clearly identified intent to the contrary, be viewed as an admission of liability that precludes non-FCA claims against third parties."  *Id*. at 1212.  Further, the court emphasized that "[i]t is incumbent on the district court to separate those claims for damages which "*only* have the effect of offsetting liability" from those that are

15

not dependent on a qui tam defendant's liability under the FCA." *Id.* at 1209. Although rulings from the Ninth Circuit are not binding on this Court, Erlanger suggests that the *Cell Therapeutics* holding "governs" this case because it is based on contractual claims that pre-date the qui tam action and because the qui tam settlement agreement contains no finding of liability [Doc. 14 at pp. 8—14].

In reply, ACS contends that the opinion in *The Heart Doctors, P.S.C. v. Layne*, No. 6:05-636, 2006 WL 2692694 (E.D. Ky. Sept. 13, 2006), is most analogous to the present situation because it similarly involved claims by a former qui tam defendant against a third party after the qui tam defendant settled with the government and the relator. Notably, the plaintiff expressly sought reimbursement of the amounts paid to the government and the amount paid in attorney's fees in the FCA action. *Id.* at *1. Following the reasoning of *Mortgages*, the Eastern District of Kentucky held that "having been found liable under the FCA, the Company may not now bring any claim against any party seeking to offset their FCA liability including any state law claims that, if prevailed on, would end in the same result." *Id.* at *3.[5]

---

[5]Erlanger and ACS make much of the court's statement that the qui tam defendant was "found liable under the FCA" when *The Heart Doctors* parties had entered into a settlement agreement. Erlanger notes that the settlement agreement with Whipple contains an express statement denying Erlanger's liability [Doc. 14 at p. 13], while ACS notes that a similar provision in *The Heart Doctors* settlement did not prevent the court from considering the context of settlement where the third-party claim will have the effect of offsetting FCA liability [Doc. 18 at p. 17]. This Court further observes that *The Heart Doctors* was decided prior to the Ninth Circuit's decision in *Cell Therapeutics*. It is unclear why *The Heart Doctors* opinion notes that the settling qui tam defendant had "been found liable under the FCA," however, this Court need not resolve that issue for the reasons set forth below.

Assuming, without deciding, that the Sixth Circuit would follow similar lines of reasoning as those in the Ninth Circuit's opinions, the Court agrees that Erlanger's settlement agreement is not an admission or finding of liability for the reasons set forth in *Cell Therapeutics*. 586 F.3d at 1210—11 ("First, settlements generally do not bar claims against non-parties or have issue-preclusive effect … on the subsequent litigation of issues not expressly resolved in the settlement. …Second, the district court's presumption that a settlement with the government is equivalent to a finding of liability would chill the settlement process, signaling to future qui tam defendants that the only way to preserve potentially legitimate claims would be to secure a litigated judgment in court."). The Court also agrees that a qui tam defendant, even one who settles with the government and/or the relator, cannot pursue claims that have the effect of contribution or indemnification of the FCA claims, as this would undermine the intended framework of the FCA to encourage relators to disclose fraudulent activity and punish wrongdoers. *See United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 20, 28—29 (D.D.C. 2007) ("FCA defendants should not be able to seek the equivalent of indemnification, even when they wrap their claim in the garb of another cause of action").

Thus, the question in this case is whether Erlanger's claims are independent or claims which "only have the effect of offsetting liability." *See Miller*, 505 F. Supp. 2d at 26—27 ("not all counterclaims in FCA cases will be contrary to the statute's interests, and … there would be real due process concerns if *all* counterclaims were to be barred, particularly compulsory ones, which would be lost forever.") (emphasis in original). Courts have described independent claims as falling within two categories:

The first … is where the conduct at issue is distinct from the conduct underlying the FCA case. This can be so even where there is a close nexus between the facts… These causes of action are truly independent of the FCA claims because none of them require as an essential element that the FCA defendant was liable – or not liable – in the FCA case. … The second category of permissible claims by an FCA defendant is where the defendant's claim, though bound up in the facts of the FCA case, can only prevail if the defendant is found *not* liable in the FCA case. …claims that succeed upon a finding that the relator's accusations were untrue.

*Id.* at 27—28; *United States ex rel. Wildhirt v. AARS Forever, Inc.*, No. 09 C 1215, 2013 WL 5304092, at *5 (N.D. Ill. Sept. 19, 2013) (quoting *Miller*).

Erlanger argues that its claims arise from the express contractual provisions of the MSA and Addendum and therefore those claims are not dependent on a finding of FCA liability [Doc. 14 at p. 13]. *See, e.g., United States ex rel. Salvatore v. Fleming*, No. 11-1157, 2015 WL 1326330, at *4 (W.D. Pa. Feb. 24, 2015) (breach of management agreement may "potentially provid[e] an independent basis for … liability aside from violation of the FCA"); *United States ex rel. Notorfransesco v. Surgical Monitoring Ass'n, Inc.*, No. 09-1703, 2014 WL 7008561, at *5 (E.D. Pa. Dec. 12, 2014) (breach of contract claim is a claim for independent damages because its success does not rely on a finding that qui tam defendant is liable under the FCA). ACS argues that the only harm alleged by Erlanger is the cost of defending and settling the qui tam action and that the 10-year delay in pursuing these claims demonstrates that they are dependent on the qui tam action [Doc. 18 at pp. 18—19].

The Court first observes that all of Erlanger's claims seek unspecified "damages" or "financial losses" that will "be proven at the trial of this cause" [Doc. 1 at ¶¶ 70, 78, 88, 99, 106, 111]. Thus, with the exception of Count VI, Indemnification, Erlanger has not

explicitly sought damages for contribution and indemnification, perhaps through careful pleading.[6]  The Court next observes that this case is procedurally different from many of the cases relied upon by the parties:  this is not a qui tam case involving counterclaims or third party claims.  Rather, like the *Cell Therapeutics* case, the present case is a separate action following the conclusion of the FCA case and concerns claims by a former qui tam defendant against a third party, not a relator.  *See Cell Therapeutics, Inc. v. The Lash Group, Inc.*, No. C07-0310JLR, 2010 WL 3064424, at *4 (W.D. Wash. Aug. 3, 2010).  Thus, the case does not present the due process concerns of a qui tam defendant with compulsory counterclaims.  *Madden*, 4 F.3d at 831.  Further, since ACS was not the relator in the FCA case, this case does not present the public policy concerns of chilling potential relators from revealing evidence of fraud against the government.  *See Miller*, 505 F. Supp. 2d at 28.  The Court also notes that none of the claims *require* proof that Erlanger was or was not liable in the FCA action.  Without question, there is a close nexus between the facts alleged in this case and the FCA case.  However, construing the complaint in the light most favorable to the plaintiff, the Court cannot conclude at this time that Erlanger's claims "only have the effect of offsetting liability."

In sum, the Court does not find, on the present record, that Erlanger's claims have the effect of contribution or indemnification and are thus precluded by the reasons set forth in *Mortgages* or *Madden.*

---

[6]Count VI is based on the indemnification provisions in the MSA and Addendum [Doc. 1 at ¶¶ 108—109].

### 3. Whether Counts I through V are Time-Barred

ACS argues that Counts I through V are barred by the applicable statutes of limitations [Doc. 8 at pp. 13—17]. Noting the six-year statute of limitations for breach of contract claims, ACS argues that the conduct complained of occurred six years before this case was filed and that no discovery rule applies. ACS also suggests that Counts II through V are "repackaged breach of contract claims" to which the six-year statute of limitations also applies. Finally, ACS argues that even if Counts II through V were distinct from the breach of contract claim, those claims are still barred by the applicable statutes of limitations.

In response [Doc. 14 at pp. 18—24], Erlanger argues that the discovery rule does apply to breach of contract claims and that whether Erlanger knew or should have known of the breach is a question of fact inappropriate for resolution by a motion to dismiss. Erlanger also argues that Counts II through V are not "subsumed by the breach of contract claim" because they are supported by independent facts. Erlanger further contends that the parties' Tolling Agreement preserved all claims that Erlanger had against the defendants arising on or after June 18, 2006.

ACS notes in reply that Erlanger has alleged in detail the misconduct by Whipple and ACS during the first six months of 2006 of which Erlanger was aware at the time. Thus, with the possible exception of Whipple's alleged theft of confidential information and PHI, ACS argues that Erlanger cannot claim that it did not discover the allegedly wrongful conduct until later [Doc. 18 at pp. 6—12]. ACS also argues that the Tolling Agreement does not preserve claims that were already time-barred at the time it was signed

or claims that were not based on Whipple's activities [Doc. 18 at pp. 12—13].[7]  Erlanger's supplemental brief contends that ACS misinterprets the scope of the Tolling Agreement and, in any event, the claims relating to the failure to protect confidential information and PHI are viable [Doc. 27].

In Count I, Erlanger alleges that ACS breached the Agreement by "failing to perform in the manner expressly and/or impliedly required" [Doc. 1 at ¶ 66], by providing Erlanger "with misguided advice and direction, and imposed a billing initiative … that was in contravention of applicable law" [*Id*. at ¶ 67], and by failing to fulfill the non-disclosure provisions in the Agreement [*Id*. at ¶¶ 68—69].  This case was filed on December 16, 2016, and the parties agree that the breach of contract claims, asserted in Count I, are subject to a six-year statute of limitations, Tenn. Code Ann. § 28-3-109(a)(3).  The parties entered into a Tolling Agreement, effective June 18, 2012, which tolled "[a]ll statutes of limitations, statutes of repose, and contractual periods of limitation which are or may be applicable to any Disputes" [Doc. 1-3 at p. 3].  The Tolling Agreement defines "Disputes" as "disputes relating to Mr. Whipple's conduct as part of the work performed for Erlanger by ACS under the Agreements, and actions taken with respect to Erlanger by Mr. Whipple, whether based in contract or tort, that either Party may assert against the other" [*Id*. at p. 2].

ACS correctly notes that a breach of contract claim generally "accrues when the breach occurs rather than the time that actual damages are sustained as a consequence of

---

[7]Erlanger does not dispute that the Tolling Agreement would not resurrect claims that were already time-barred, such as breach of contract claims arising prior to June 18, 2006 [Doc. 27 at p. 4, n.2].

the breach." *Dean Witter Reynolds, Inc. v. McCoy*, 853 F. Supp. 1023, 1036 (E.D. Tenn. 1994); *Kinnard v. Shoney's, Inc.*, 39 F. App'x 313, 317 (6th Cir. 2002). In addition, Erlanger is correct that Tennessee does recognize a discovery rule in cases "where the breach of contract is inherently undiscoverable." *Goot v. Metropolitan Gov't of Nashville & Davidson Cty.*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005). While Erlanger contends that it is a question of fact whether it knew or should have known that a breach of contract occurred [Doc. 14 at pp. 19—20], the Court disagrees.

As ACS notes, the complaint sets forth extensive allegations of actions by ACS and Whipple of which Erlanger was aware at the time and expressed concern. *See, e.g.*, Doc. 1 at ¶¶ 32—39, 41—44. Specifically, Erlanger alleges a meeting in February 2006 in which staff "expressed concerns that what ACS's consultants were asking them to do would violate applicable law" [*Id.* at ¶ 37]. At an unspecified time after mid-February 2006, "Erlanger employees grew increasingly concerned about ACS's observation rebilling initiative" [*Id.* at ¶ 39]. Similarly, "[i]n March 2006, Erlanger staff met with Whipple to discuss Erlanger's concerns regarding records where patient status had been changed from observation to inpatient" [*Id.* at ¶ 41]. On May 1, 2006, Erlanger received a complaint through its internal compliance hotline regarding Whipple's request that "billing status be changed from outpatient to inpatient in certain medical records without physician's orders" [*Id.* at ¶ 43]. "From May to July 2006, Erlanger's Chief Compliance Officer and certain staff met on multiple occasions to review accounts where Whipple had changed the patient status from observation to inpatient without a physician order" [*Id.*]. Finally, "[i]n June

2006, Erlanger's Chief Compliance Officer informed Erlanger employees that if they saw any more accounts where Whipple made status changes, they needed to call the compliance hotline or notify Erlanger leadership directly and immediately" [*Id*. at ¶ 44].

All of these allegations describe events that occurred prior to June 18, 2006, and of which Erlanger has acknowledged awareness as they occurred. Thus, while Erlanger may not have known *all* of the alleged misconduct by Whipple and ACS at the time or the repercussions of such acts, Erlanger cannot rely on the discovery rule to save claims of which it had actual or constructive knowledge. *See Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 608 (Tenn. Ct. App. 2014) ("the discovery rule does not allow the plaintiff to delay filing suit until he knows the full extent of his damages, or the specific type of legal claim he has"). Therefore, to the extent that Erlanger's breach of contract claim is based on events prior to June 18, 2006, the claim is time-barred. To the extent that Erlanger's breach of contract claim is based on events occurring after June 18, 2006, the claim is not time barred.

ACS correctly notes that Erlanger's breach of warranty claim (Count II) arises from the Agreement and ACS's alleged failure to "perform work under the MSA in a workmanlike and professional manner consistent with the level of care and skill ordinarily exercised in its business and professional field" [Doc. 1 at ¶ 72]. However, the Agreement did not involve a sale of goods, but rather an agreement for the provision of services. Accordingly, Erlanger is correct that the statute of limitations for the sale of goods, Tenn. Code Ann. § 47-2-725, does not apply and this claim is governed by the six-year limitations

period of Tenn. Code Ann. § 28-3-109(a)(3). As with Count I, to the extent that this claim is based on events that occurred prior to June 18, 2006, the claim is time-barred.

With respect to the breach of fiduciary duties claim (Count III), the complaint alleges that the parties "were in a principal-agent relationship" by virtue of the Agreement and that ACS owed Erlanger fiduciary duties as a result of this agency relationship [Doc. 1 at ¶¶ 80—83]. Thus, this claim is quasi-contractual in nature and the applicable statute of limitations is six years pursuant to Tenn. Code Ann. § 28-3-109(a)(3).[8] *Kinnard*, 39 F. App'x at 317; *Dean Witter Reynolds, Inc.*, 853 F. Supp. at 1035. As with Count I, to the extent that this claim is based on events that occurred prior to June 18, 2006, the claim is time-barred.

Counts IV and V assert claims of negligent misrepresentation and negligence, respectively [Doc. 1 at ¶¶ 89—106]. ACS contends that these claims are based on the purported breach of the Agreement and ACS owed no duties to Erlanger independent of the Agreement. Thus, ACS argues these claims are subject to dismissal as time-barred for the same reason as the contract claim [Doc. 8 at p. 16]. Although Erlanger argues that these are independent claims and subject to the discovery rule [Doc. 14 at p. 24], the language of the complaint suggests otherwise.

---

[8]Erlanger argues that the proper statute of limitations for breach of fiduciary duty claim is the three-year limitations period in Tenn. Code Ann. § 28-3-105 [Doc. 14 at p. 23]. However, the three-year limitations period appears to apply when the breach of fiduciary duty claim sounds in tort for injury to personal property. *See* Tenn. Code Ann. § 28-3-105; *Smith v. Hilliard*, 578 F. App'x 556, 563 (6th Cir. 2014).

The negligent misrepresentation claim specifies that ACS was "acting within the course and scope of its business, professional, and/or contractual relationship with Erlanger" and "negligently supplied false information to Erlanger by failing to exercise reasonable care and/or competence in obtaining information surrounding the Agreement" [Doc. 1 at ¶¶ 90—91]. Further, the complaint alleges that ACS's representations were "intended … to induce Erlanger to enter into the Agreement with ACS" and then "ACS failed to fulfill these obligations under the Agreement" [Doc. 1 at ¶¶ 94—95]. As to the negligence claim, Erlanger alleges that "ACS assumed a duty of care to perform work under the MSA in a workmanlike and professional manner" and "[p]ursuant to the MSA, ACS also expressly assumed a duty to hold any proprietary information it received from Erlanger 'in confidence'" [Doc. 1 at ¶¶ 101—102]. Thus, the plain language of the complaint describes these duties as arising from the parties' Agreement. ACS correctly cites the well settled law that a tort cannot be predicated on a breach of contract and can only exist if a party breaches a duty owed independently of the contract. *Calipari v. Powertel, Inc.*, 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002) (citing *Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1375 (6th Cir. 1991)). Accordingly, for the same reasons as stated for the breach of contract claim, to the extent that the negligent misrepresentation and negligence claims are based on events occurring before June 18, 2006, those claims are time-barred.[9]

_____

[9]Assuming that Counts IV and V were not contract-based claims, the statute of limitations for claims of negligence and negligent misrepresentation is three years. Tenn. Code Ann. § 28-3-105 (injury to personal property); *Med. Educ. Assistance Corp. v. State ex rel. East Tenn. State Univ. Quillen College of Med.*, 19 S.W.3d 803, 817 (Tenn. Ct. App. 1999) (negligent misrepresentation).

4.      Whether Erlanger Waived Any Indemnification Claim

The next issue is the parties' competing positions on whether Erlanger waived its claim for indemnification (Count VI) by settling the FCA suit without ACS's knowledge and approval [Doc. 8 at pp. 21—23]. While acknowledging that Erlanger provided notice of the FCA suit via a June 18, 2012 letter from its counsel [Doc. 7-3],[10] ACS points out that the letter does not demand indemnification from ACS and only requests information regarding PHI and other confidential information.

Erlanger first argues that it did not waive its right to indemnity because the FCA settlement was made voluntarily and in good faith [Doc. 14 at pp. 14—15], which ACS does not dispute. Erlanger argues that it provided timely notice of the lawsuit and that it was not required to provide notice of the settlement. Further, Erlanger points to the indemnification provisions of the MSA and Addendum which only require notice "of any such claim" and the letter from counsel provided ample notice of ACS's indemnification obligations [*Id*. at pp. 16—17]. In reply, ACS contends that Erlanger's notification of the FCA suit, without offering ACS a full opportunity to defend and participate in the FCA action, was not sufficient to save the indemnification claim [Doc. 18 at pp. 20—22].

Thus, they would be time-barred well before the parties signed the Tolling Agreement. Accordingly, the Court need not address whether Erlanger has pled a plausible claim of negligent misrepresentation or negligence [Doc. 8 at pp. 18—21].

[10]ACS attached a copy of the June 18, 2012 letter to its motion to dismiss [Doc. 7-3] and urges the Court to consider it, along with the FCA case settlement agreement, in reviewing the motion to dismiss [Doc. 8 at p. 7]. ACS also cites the Sixth Circuit authority that the Court may consider "exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein" [*Id*. citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)]. The Court notes that the June 18, 2012 letter is specifically referenced in the Complaint [Doc. 1 at ¶¶ 57—60] and that Erlanger has not objected to consideration of the letter in conjunction with the motion to dismiss.

The MSA provides that the parties "shall each indemnify, defend, and hold harmless the other from and against any third-party claims for loss, damage, expense (including attorneys' fees) liability … caused by the negligent acts or omissions of the indemnifying party, its employees, agents or subcontractors" [Doc. 1 at ¶ 22; Doc. 1-2 at p. 14]. The MSA further provides that "[e]ach party shall promptly, and in writing, notify the other party of any such claim made against it by any third party, and shall take action as may be necessary to avoid default or other adverse consequences until such time as the other party has a reasonable opportunity to assume the defense of the claim" [Doc. 1-2 at p. 14]. The Addendum to the MSA also provides that ACS will indemnify Erlanger for "any claim, cause of action, liability, damage, cost or expense, including attorneys' fees and court or proceeding costs" resulting from a breach of the Addendum by ACS [Doc. 1 at ¶ 24; Doc. 1-2 at p. 9]. Erlanger agreed to "(i) promptly notify ACS HCS of any such claim or suit by a third party; (ii) permit ACS HCS to assume sole authority to conduct the trial or settle such claim at the indemnifying party's own expense; and (iii) provide information and assistance at its own expense reasonably requested by ACS HCS" [Doc. 1-2 at p. 9].

As set forth in the complaint, the FCA suit was unsealed on May 1, 2012 and the letter from Erlanger's counsel to ACS was sent June 18, 2012, approximately six weeks later [Doc. 1 at ¶¶ 54, 57]. The letter unquestionably notified ACS of the qui tam suit pending against Erlanger. Thus, the Court finds that Erlanger "promptly" gave ACS notice of the pending claim within the meaning of the MSA and Addendum indemnity clauses. *See, e.g., Fulton Bellows, LLC v. Fed. Ins. Co.*, 662 F. Supp. 2d 976, 990 (E.D. Tenn. 2009) ("prompt" notice "generally means that the notice must be given within a reasonable time

under the circumstances of the case") (quoting *Allstate Ins. Co. v. Wilson*, 856 s.W.2d 706, 707—09 (Tenn. Ct. App. 1992)); *Tenn. Farmers Mut. Ins. Co. v. McNabb*, 1991 WL 213763, at *2 (Tenn. Ct. App. Oct. 24, 1991) ("we interpret the policy provision in the instant case requiring prompt notice to mean reasonable notice under the circumstances").

The Court has carefully reviewed the authorities relied upon by the parties, including *In re Pro Page Partners, LLC*, No. 03-2042, 2007 WL 1557207 (Bankr. E.D. Tenn. May 25, 2007), and *Jones v. Bozeman*, 321 S.W.2d 832 (Tenn. Ct. App. 1958). *Bozeman* states the general rule that an indemnitor must be given notice of the prior claim and an opportunity to defend it before the indemnitor may be held liable. 321 S.W.2d at 838; *see Clinchfield RR. Co. v. U.S. Fid. & Guar. Co.*, 160 F. Supp. 337, 340 (E.D. Tenn. 1958) ("Notice and an opportunity to defend the action against the indemnitee are necessary to render the judgment against the indemnitee conclusive of the indemnitor"). In considering when an indemnitor is bound by a previous judgment, the *Pro Page Partners* court carefully reviewed the *Bozeman* decision, noting the focus on whether the indemnitor had a "*full* opportunity … to defend the action." 2007 WL 1557207, at *7 (quoting *Bozeman*, 321 S.W.2d at 838). Concluding that no "magic words" are required to provide adequate notice, the *Pro Page Partners* court held that a "full opportunity to defend" must include "that the indemnitor be advised in some fashion that the indemnitee seeks to hold him liable under the indemnity agreement such that the indemnitor is placed on constructive notice that the failure to offer a full and complete defense may result in the finding of liability against him." *Id*. at *8.

Whether Erlanger's notice was sufficient to trigger ACS's indemnification obligations cannot be determined on the present record. The indemnification provisions of both the MSA and the Addendum contain obligations in addition to the provision of prompt notice and of which there is a complete absence of evidence. The MSA indemnity provision requires Erlanger to "take action as may be necessary to avoid default or other adverse consequences until such time as [ACS] has a reasonable opportunity to assume the defense of the claim." There is no evidence on the present record as to what actions Erlanger did or did not take, or what efforts ACS made to "assume the defense" of the qui tam case. Additionally, the Addendum requires Erlanger to "permit ACS HCS to assume sole authority to conduct the trial or settle such claim" and "provide information and assistance at its own expense reasonably requested by ACS." Again, there is no evidence on the present record of ACS's efforts to "assume sole authority" of the qui tam trial, whether any such efforts were rebuffed by Erlanger, or whether Erlanger provided any requested information and assistance to ACS. In short, the Court simply cannot determine at this time whether the parties satisfied their mutual obligations under the indemnity agreements, and thus, whether Erlanger waived its indemnification claim or not.

C.     ACS's Alternative Motion for a More Definite Statement [Doc. 7]

ACS alternatively argues that Erlanger should be required to provide a more definite statement as to the unnamed "ACS consultants" engaged in the alleged wrongful conduct and also a more definite statement as to damages beyond those incurred as a result of the FCA action [Doc. 8 at pp. 23—25]. Erlanger responds that the complaint gives ACS fair

notice of the claims as required by Fed. R. Civ. P. 8(a) and that more detailed information is more properly sought through discovery [Doc. 14 at pp. 31—35]

Rule 12(e) of the Federal Rules of Civil Procedure provides, "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The granting of these motions is generally disfavored by district courts, given the liberal notice pleading standards of federal civil procedure and the accompanying nature of pretrial discovery. *See, e.g., Fed. Ins. Co. v. Webne,* 513 F. Supp. 2d 921, 924 (N.D. Ohio 2007) ("Federal courts generally disfavor motions for more definite statements. In view of the notice pleading standards of Rule 8(a)(2) and the opportunity for extensive pretrial discovery, courts rarely grant such motions."). A motion under Rule 12(e) should not be granted unless the complaint is "'so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.'" *Shirk v. Fifth Third Bancorp,* No. 05-cv-049, 2008 WL 4449024, *8 (S.D. Ohio Sept. 26, 2008) (quoting *Kok v. First Unum Life Ins. Co.,* 154 F. Supp. 2d 777, 781–82 (S.D.N.Y. 2001)). Accordingly, if the complaint meets the notice pleading requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, the motion should be denied. *Shirk*, 2008 WL 4449024, at *8.

The Court does not find that the instant complaint is so vague and ambiguous as to be unintelligible or to seriously prejudice ACS in responding to it. While ACS's desire to identify its own unnamed consultants who may have engaged in the alleged conduct is understandable, those details will surely be revealed during discovery. As Erlanger notes,

the consultants are not named as parties, contrary to the authority relied upon by ACS. *See Joslin*, 2013 WL 2250712, at *6 (Rule 12(e) motion granted as to police officers named as defendants but not alleged to have had any role in misconduct); *D&M Mill Work, Inc. v. Elite Trimworks, Corp.*, 2008 WL 5272471, at *2 (M.D. Tenn. Dec. 18, 2008) ("the motion is even less well received when the movant simply seeks particularization of facts already known to it") (quoting *Moore's Federal Practice* 3d § 12.36). Further, while Erlanger has generally alleged damages, discovery is the more appropriate vehicle for obtaining more detailed information as to the types and amounts of such damages. Accordingly, ACS's motion for a more definite statement will be denied.

## IV.    Conclusion

For the reasons set forth herein, defendant Xerox Corporation's motion to dismiss [Doc. 9] will be **GRANTED**; defendant Xerox Business Services, LLC's motion to dismiss [Doc. 7] will be **GRANTED in part** and **DENIED in part**; and the motion for more definite statement [Doc. 7] will be **DENIED**.[11]

An appropriate order will be entered.

s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE

---

[11]In a footnote request, Erlanger suggests that if any of its claims are subject to dismissal that they be dismissed without prejudice and Erlanger be given the opportunity to amend the complaint [Doc. 14 at p. 35, n.10]. Should Erlanger wish to amend its complaint, the Court will consider such a request upon the filing of a properly supported motion in compliance with Fed. R. Civ. P. 15 and E.D. Tenn. L.R. 15.1. *See Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) ("A 'request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is … not a motion to amend.'") (quoting *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010)).